IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 21, 2004 Session

## JAMES R. MORRISSETT, JR.
v.
## ROBBIE CLAIRE McKEE MORRISSETT

**An Appeal from the Chancery Court for Henderson County**
**No. 14912     Joe C. Morris, Chancellor**

―――――――――

**No. W2003-01052-COA-R3-CV - Filed July 23, 2004**

―――――――――

This is a divorce case. The parties were married in 1972. In 2001, the husband filed for divorce based on inappropriate marital conduct and irreconcilable differences, and the wife counterclaimed for divorce on the basis of inappropriate marital conduct. After the March 2002 trial, some of the parties' main assets were sold in foreclosure. In October 2002, the trial court granted a divorce to the wife on the grounds that the husband had committed adultery. The divorce decree resolved all of the property issues between the parties. The trial court also found implicitly that the wife could not be rehabilitated, based on a letter from the wife's physician, and awarded alimony *in futuro*. Two weeks later, the husband filed a motion for reconsideration, based in part on the interim sale of some of the parties' assets and the husband's consequent inability to fulfill his obligations under the decree. In April 2003, the trial court denied the husband's motion to reconsider. From that order, the husband now appeals and challenges many of the trial court's rulings. We affirm the trial court's division of the marital property and its allocation of the marital debts. We find, however, that the letter from the physician was inadmissible hearsay, and consequently reverse the trial court's award of alimony *in futuro* and remand for an award of rehabilitative alimony and for other proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed in part, Reversed in part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Teresa McCaig Marshall, Paris, Tennessee, for the appellant, James R. Morrissett, Jr.

Robbie Claire McKee Morrissett, appellee, *pro se*.

**OPINION**

Plaintiff/Appellant James R. Morrissett ("Husband") and Defendant/Appellee Robbie Claire McKee Morrissett ("Wife") were married in July 1972. The parties had two children, daughter Jamie born in November 1973, and son Joseph born in March 1984. Husband was employed as the general manager and vice president of Huntingdon Morrissett Tire Service Store ("Morrissett Tire"), a family-owned business in which he owned a third of the stock. During most of the marriage, Wife was not employed outside the home.

On April 23, 2001, Husband filed a complaint for divorce in the trial court below, based on grounds of inappropriate marital conduct and irreconcilable differences. In June 2001, Wife filed an answer and counterclaim for divorce, alleging that Husband had engaged in inappropriate marital conduct and that irreconcilable differences had arisen between them. Wife sought alimony, an equitable division of marital property, an equitable allocation of marital debts, attorney's fees, and costs. The parties' two children had both reached majority by the time of trial
.

The trial was conducted on March 28, 2002. Both Husband and Wife testified, with testimony focused on the issues of inappropriate marital conduct, property division, and alimony. Husband testified first. At the outset, he asserted that he had never been unfaithful to Wife. He admitted a close relationship with Amy Woolery ("Amy"), a woman who worked in a business across the street from his workplace, and conceded that she had visited his house and had spent the night there with him when he was sick. Husband said that the parties' son Joseph was "[v]ery much aware" of his relationship with Amy. In addition, Husband admitted that he had met with Nancy Holloway ("Nancy"), his pastor's wife, "[o]nce or twice" in "secluded areas" prior to her divorce from her husband. He maintained, however, that he had never had a sexual relationship with either Amy or Nancy. Husband asserted that Wife had a boyfriend named Buddy Jones ("Jones"), but he did not know whether Wife started dating Jones before or after the complaint for divorce was filed.

Husband then testified about his employment. In his job as general manager of Morrissett Tire, Husband ordinarily earned $35,000 per year. In November 2001, however, he had a knee replacement and was forced to stop working. In January 2002, he resumed working on a part-time basis. Working part-time, Husband claimed that he was earning $250 per week, about half of his normal full-time compensation. Morrissett Tire provided Husband with a truck to drive, and his family health insurance premium and the premium on a $335,000 life insurance policy were paid by the company. Husband testified that Morrissett Tire lost $30,000 in 2001. To attempt to supplement his income, Husband stated, he got into the cattle business for five years, but the business was unsuccessful. He also "went in a partnership on some horses," but that business was likewise unsuccessful. Husband said that he still had some outstanding debts from those failed endeavors.

Husband testified at trial that he had a $170,000 debt to Carroll Bank & Trust, with a payment of $1,900 per month. At the time of trial, Husband said that he was behind on those payments, and that the bank had threatened to foreclose on his house. Husband also testified that he had gotten behind on the monthly payments on the parties' Mercury Mystique, ordinarily driven

by Wife. Husband said that the car had been repossessed twice, and that he had to borrow money from his mother to get the car back for Wife. The parties still owed $8,500 on the Mercury Mystique. Husband acknowledged further that he had not paid the property taxes on the marital home for at least one or two years.

Husband then testified about the Wife's ability to maintain gainful employment. He stated that she graduated from Jackson State Community College, and that she earned a degree in interior design from Lambuth University with honors. Husband paid all of the costs associated with her education. He stated that Wife had sporadically earned money painting murals and working at weddings, but that she chose not to work regularly or contribute financially to the marriage. Husband said that Wife had told him that she chose not to work because, she said, "the Lord doesn't lead her to work. He's done away with all her mundane chores in her life so she can study Him." He later recalled that Wife was a substitute teacher on a part-time basis for two years. Husband acknowledged that Wife was under the care of a physician for a chemical imbalance.

Husband claimed that, during the last few years of the parties' marriage, Wife had not been active in their son's life. When asked about who raised the parties' two children, Husband responded, "Basically when my daughter—she helped with it. When Joseph came along, basically my parents and I raised Joseph."

Husband then explained his reasons for seeking a divorce. He asserted that Wife was not committed to the marriage, gave him no moral or financial support, and withheld physical contact. He said that he and Wife did not have sex for ten years after their daughter was born. He was aware that Wife accused him of inappropriate conduct, but asserted that he had not engaged in affairs with other women. Despite Wife's behavior toward him and her claimed depression, Husband asserted that Wife had an active social life, that she went out at night with her sister and took trips to Mississippi to see friends.

Wife submitted the testimony of Keith Holloway ("Holloway"), the parties' former pastor, and the husband of Nancy Holloway, with whom Husband had denied having an affair. Holloway testified that he had been the pastor at the church attended by Husband and Wife for several years, though he no longer held that position. Holloway said he divorced his wife Nancy in 2000. Holloway testified that he had been suspicious of the relationship between his former wife and Husband, so he hired a private investigator. Holloway was asked whether the investigator found Husband and Nancy together in "secluded areas." When Husband's counsel objected to that testimony as hearsay, the trial court said, "Overruled. You're probably right, Mr. Dempsey. I just want to hear it." The question was then rephrased, "[W]hat was learned about the relationship between [Husband] and Ms. Holloway[?]" Holloway said that the private investigator's report showed that Husband and Nancy were, in fact, meeting in secluded areas. Holloway testified that both confessed to him that there was an attraction between them, and they told him that they had discussed "getting together and maybe even getting married later on down the road" if "anything happened between" Husband and Wife. Through the investigator's report, Holloway also discovered that Husband and Nancy would "rendezvous" with the help of another friend. He said, "[Y]ou have

to understand these were very hard times for all of us." Holloway testified that Wife was of good character, and that she was "extremely religious." Holloway further stated that, while he was pastor at the church the parties attended, Husband had a "[g]ood, strong commitment" to the church.

Wife then testified on her own behalf. As background, Wife said that she met Husband when she was a student at Jackson State, and that they married after a three-month courtship, when she was only nineteen years old. Wife worked in a minimum-wage position at Sears until the birth of their daughter in November 1973. After their daughter was born, Wife taught part-time as a substitute teacher for several years. She later decided that she wanted to "get out of [her] marriage," so she went back to school "to make a career for [herself] to leave." Wife graduated from Lambuth in 1991. She claimed that her marriage made her sick, and that she started working at a Christian book store, but that she had to quit because of her illness. She then attempted to teach private art lessons in the county schools, but claimed that she had to quit giving lessons because of her illness. Wife stated that she had made some money doing odd jobs, but never enough to report on an income tax return. For example, on one occasion, she made $500 for decorating a wedding. Wife said that her marriage had caused her to have breakdowns, depression, and anxiety attacks.

Wife testified she began seeing Terry Harrison, M.D. ("Dr. Harrison"), in 1995 to obtain medication to help her cope with her illnesses. Wife submitted into evidence a letter from Dr. Harrison, over Husband's hearsay objection. The letter from Dr. Harrison stated that Wife had "had a marked amount of problems with depression and her nerves. At times she is unable to interact socially and would be unable at this time, in my opinion, to hold down gainful employment secondary to her depression." Dr. Harrison further opined that he expected Wife "to continue on medication for quite some time." Wife testified that Dr. Harrison had prescribed Paxil for her to take at midday for anxiety and Amitriptyline at night to help her rest. Wife's activities during the day included housework, yardwork, and taking care of her home. She claimed that she needed her home because it nurtured her, stating, "I need quiet. I need my rest. I need a place away from stress." Wife said that she would want the marriage to continue if it could be stress-free, but that her marriage to Husband made her "suffer beyond endurance." She testified that she was frightened about the future, because she did not know how to support herself, and had never been able to do so.

Over the objection of Husband's counsel, Wife testified that her son had told her that Husband was seeing Amy Woolery, and that Amy had spent the night with Husband, sharing the same bed. Wife claimed that Husband had had affairs "all through our marriage." She asserted that in the first year of their marriage, she found a letter indicating that Husband had been with another woman during the first three months of the marriage. Wife said that she was so upset by this that she miscarried, and that that was the point at which she quit her job at Sears. She acknowledged that she did not sleep with Husband for years, and said that it was "because I was such a basket case. I had to just withdraw." Wife further stated, "My sisters say that I have never been the same. It's just done a number on me."

At the conclusion of the March 2002 trial, the trial court asked the parties to submit proposed orders on the issues at trial. On October 7, 2002, the trial court entered an order granting Wife's

counterclaim for divorce, making the order effective *nunc pro tunc* to March 28, 2002, the trial date. The trial court found that Husband had committed adultery during the marriage, and awarded the divorce to Wife on that basis. Wife was awarded the real property, consisting of a house and forty-eight acres of land, the Mercury Mystique, the cash surrender value of all the parties' life insurance policies, and all personal property in her possession as separate property. Husband was awarded the parties' stock in Morrissett Tire, the First Bank checking account, four horses, the sixteen foot stock trailer, and all personal property in his possession as separate property.

With respect to the parties' debt, Husband was ordered to assume the debts to Carroll Bank and Trust, David Frizzell, trustee (property taxes), and Carroll Bank & Trust Visa. Wife was ordered to assume the debts to McKee's Grocery, Dr. Harrison, First Bank, Marcie McNutt, and Jones' Pharmacy. The trial court explained that, in allocating the parties' debt, it considered the respective financial status of the parties, each party's prior work experience, and each party's ability to be gainfully employed. The trial court reasoned:

> Husband's assumption of these debts will free more of Wife's future income, which is necessary to assist in supporting Wife. This support is necessary to assist in meeting the daily living expenses of the non-obligor spouse. This assumption of debt is in lieu of additional support for Wife, and it is the intent of the Court to create a support obligation because it will have the actual effect of providing necessary support, and the amount is not so excessive as to be unreasonable under traditional concepts of support. The parties further understand that the obligation of Husband to assume these debts shall survive Wife's death or remarriage and is not contingent thereon. The Court intends by this assumption to create a support debt that will be non-dischargeable in the event of the bankruptcy of the obligor spouse, pursuant to 11 U.S.C. § 523(a)(5).

Thus, the trial court allocated a disproportional amount of debt to Husband in lieu of additional support for Wife.

The trial court ordered Husband to pay Wife alimony *in futuro* in the amount of $1,000 per month until her death or remarriage, with the payments not to terminate upon Husband's death. As security for the alimony payments, Husband was ordered to insure his own life in the minimum amount of $250,000, with Wife as the irrevocable beneficiary. The trial court further ordered Husband to maintain health insurance for Wife, and to pay the premiums for such insurance. Finally, Husband was ordered to pay Wife alimony *in solido* in the amount of $3,721.11 toward Wife's attorney's fees, and to pay court costs and mediation costs.

On October 22, 2002, Husband filed a motion for rehearing, reconsideration, and/or for a new trial. Husband argued that in the six-month period between the March 2002 trial and the October 2002 final decree, circumstances had changed, making it impossible for Husband to perform some of the requirements in the decree. On November 8, 2002, a hearing was held on Husband's motion. On March 26, 2003, Husband submitted a brief to the trial court outlining supplemental facts as an

additional basis for granting his motion. With his brief, Husband submitted documentation showing that, since the time of trial, he had defaulted on the loan from Carroll Bank & Trust, and the bank had foreclosed on the house and the Morrissett Tire stock. On April 4, 2003, the trial court entered an order denying Husband's motion. From that order, Husband now appeals. In June 2003, Wife's attorney of record withdrew from the case, and Wife represents herself *pro se* in this appeal.

On appeal, Husband raises the following issues:

(1) Whether the trial court erred in granting a divorce to Wife alone based on adultery, rather than concluding that both parties were equally at fault?

(2) Whether the trial court erred in failing to sustain a hearsay objection to Holloway's testimony regarding the information in the private investigator's report?

(3) Whether the trial court erred in distributing the marital property and allocating the debt between the parties?

(4) Whether the trial court erred in failing to sustain a hearsay objection to the letter from Dr. Harrison?

(5) Whether the trial court erred in awarding alimony *in futuro*, rather than rehabilitative alimony?

(6) Whether the trial court erred in awarding $1,000 per month in alimony in light of Husband's ability to pay?

(7) Whether the trial court erred in requiring Husband to provide Wife medical insurance coverage?

(8) Whether the trial court erred in requiring Husband to maintain a $250,000 life insurance policy?

(9) Whether the trial court erred in requiring Husband to pay $3,721.11 as alimony *in solido*?

(10) Whether the trial court erred in denying Husband's motion for rehearing, reconsideration, and/or new trial based upon a substantial change in circumstances?

Because this case was tried by the court sitting without a jury, the trial court's findings of fact are reviewed *de novo* on the record, with a presumption that those findings are correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Nelson v. Nelson*, 106 S.W.3d 20, 22 (Tenn. Ct. App. 2002). The trial court's conclusions of law are reviewed *de novo*, with no such presumption. *Nelson*, 106 S.W.3d at 22.

Husband first argues that the trial court erred in granting a divorce to Wife, rather than concluding that both parties were entitled to a divorce based on inappropriate marital conduct. We review the trial court's decision as to which party is entitled to the divorce for an abuse of discretion. *Crowell v. Crowell*, No. E1999-00348-COA-R3-CV, 2000 WL 688568, at *10 (Tenn. Ct. App. May 30, 2000).

The trial court granted the divorce to Wife, based on its finding that "Husband has been guilty of adultery." Section 36-4-129(b) of the Tennessee Code Annotated provides:

> (b) The court may, upon stipulation to or proof of any ground for divorce pursuant to § 36-4-101, grant a divorce to the party who was less at fault or, if either or both parties are entitled to a divorce, declare the parties to be divorced, rather than awarding a divorce to either party alone.

Tenn. Code Ann. § 36-4-129(b) (2001). Although the record includes evidence that Wife also engaged in inappropriate marital conduct, the trial court did not expressly address the merits of Husband's petition for divorce. We must conclude that the trial court implicitly found that Wife was less at fault than was Husband. The resolution of such issues necessarily involves determinations of credibility, which are accorded great weight on appeal. *Sullivan v. Sullivan*, 107 S.W.3d 507, 510 (Tenn. Ct. App. 2002). "Accordingly, we will not reevaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Id.* Giving appropriate deference to the trial court's assessment of the parties' credibility, the trial court's implicit finding that Wife was less at fault is not contrary to the preponderance of the evidence at trial. Therefore, the trial court's decision to grant the divorce to Wife is affirmed.

Husband also claims that the trial court committed reversible error in allowing the pastor, Holloway, to testify regarding the information in his private investigator's report, because that information constituted hearsay. The trial court's resolution of whether a statement is hearsay and whether it nevertheless is admissible under a hearsay exception is reviewed for an abuse of discretion. *State v. Stout*, 46 S.W.3d 689, 697 (Tenn. 2001).

Holloway testified about the contents of the private investigator's report, though the report itself was not submitted into evidence at trial. Holloway stated that the report revealed that Husband and Nancy, the pastor's wife, had been found together in secluded areas. Holloway also said that the report showed that a mutual friend had arranged meetings between Husband and Nancy, and that the friend would drive Nancy to meet Husband. Testimony on the report was submitted to show that Husband committed adultery. Assuming *arguendo* that Holloway's testimony on the investigator's report constitutes inadmissible hearsay, the undisputed evidence was sufficient for the trial judge to conclude that Husband had committed adultery. Although Husband denied a sexual relationship with either Amy Woolery or Nancy Holloway, Husband admitted to having met with Nancy in secluded areas, and admitted that Amy had spent the night at his home. Husband does not contend that the evidence was insufficient to find that he had engaged in inappropriate marital conduct; rather, he claims that the evidence showed that Wife was guilty of inappropriate marital conduct as

well.  Under these circumstances, any error in admitting into evidence Holloway's testimony regarding the private investigator's report would be deemed harmless in light of the undisputed evidence showing Husband's misconduct.  *See Herrera v. Herrera*, 944 S.W.2d 379, 384-85 (Tenn. Ct. App. 1996) (finding it was harmless error to admit report of guardian *ad litem*, which contained inadmissible hearsay, because the trial court considered other evidence in determining that appellant's fitness as custodial parent).

Next, Husband challenges the trial court's distribution of marital property and allocation of marital debt.  The trial court is given wide discretion in this regard, and the trial court's division of the marital estate will not be disturbed on appeal unless the "decision is contrary to the preponderance of the evidence or is based on an error of law."  *Sullivan*, 107 S.W.3d at 512.

The trial court is not obligated to divide the parties' marital property equally, but equitably. *Id.* at 511-12.  In dividing the marital property, the trial court must consider the factors set forth in Tennessee Code Annotated § 36-4-121(c):

> (c) In making equitable division of marital property, the court shall consider all relevant factors including:
>
> > (1) The duration of the marriage;
> >
> > (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> >
> > (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
> >
> > (4) The relative ability of each party for future acquisitions of capital assets and income;
> >
> > (5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
> >
> > (6) The value of the separate property of each party;
> >
> > (7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (2001 & Supp. 2003). Fault is not considered in the division of marital property. Tenn. Code Ann. § 36-4-121(a)(1) (2001 & Supp. 2003).

Husband argues that the statutory factors weigh against the trial court's allocation of property and debt in this case. The parties were married for almost thirty years. At the time of trial, Husband was fifty-three years old and Wife was forty-nine years old. Wife had more years of education; Husband attended three years of college and Wife has a degree in interior design earned at Lambuth during the marriage. During the marriage, Husband made a large proportion of the financial contributions to the marriage, including the expenses related to Wife's education. Wife made intangible contributions to the marriage, including her role as homemaker and parent. During the marriage, Husband worked at Morrissett Tire earning a regular salary of $35,000 per year, plus benefits, including a truck to drive, gas, work clothes, health insurance, and life insurance.[1] In contrast, Wife's only regular work was in the early years of the parties' marriage; in the beginning of the marriage, Wife worked as a sales assistant at Sears earning minimum wage, and after their daughter was born, Wife worked part-time as a substitute teacher. Later, she worked for a short period at a religious book store and attempted to teach private art lessons at a public school. She testified that she quit those jobs because of her mental and emotional illness. Husband acknowledges that Wife struggles with a chemical imbalance.

The evidence submitted on the value of the parties' marital assets was scarce at best. As to most of the marital property, each party submitted into evidence his or her own valuations of the property.[2] As noted above, Wife was awarded the marital home and the land on which it was situated (value ranging from $80,000 to $90,000), the Mercury Mystique ($5,250), and the cash surrender value of the parties' life insurance policy (approximately $2,000). Therefore, Wife's only liquid asset was the $2,000 she could receive by cashing out the parties' life insurance policy.

---

[1] While recovering from knee surgery, Husband reduced his workload, and consequently reduced his monthly income to $1,400 per month.

[2] In some instances, Husband's submission did not include all of the assets and debts included in Wife's submission. In those instances, Wife's valuations of assets and debts must be considered undisputed.

Husband was awarded his stock in Morrissett Tire (value ranging from $60,704 to $259,273), the parties' checking account (value ranging from $500 to $2,000), and four horses with a trailer ($19,500). The estimated value of the Morrissett Tire stock was disputed, with Husband claiming a value of approximately $60,704 and Wife claiming it was worth approximately $259,273. Wife's estimate of the value of the stock was supported by a financial statement submitted to Carroll Bank & Trust by Husband in December 2000. Using Wife's valuations, Husband received marital assets valued well in excess of the assets awarded to Wife. With respect to debt, however, the trial court clearly allocated to Husband the bulk of the parties' debt. Husband was allocated the debt to Carroll Bank & Trust ($180,000), the property taxes on the parties' home ($1,315), and the Carroll Bank & Trust Visa ($1,000), totaling approximately $182,315. Wife was assigned the parties' debts to McKee's Grocery ($1,900), Dr. Harrison ($103), First Bank ($3,129), Marcie McNutt ($150), and Jones' Pharmacy ($250), totaling approximately $5,532. The trial court explained the disparity in the allocation of debt, stating, "Husband's assumption of these debts will free more of Wife's future income, which is necessary to assist in supporting Wife." The trial court concluded that "the amount is not so excessive as to be unreasonable under traditional concepts of support."

Based on the preponderance of the evidence submitted at trial, we find that the trial court did not err in its assignment of marital property and debt in this case. Husband clearly has the greater income stream and earning capacity, and Husband was awarded the parties' most valuable asset, the Morrissett Tire stock. Therefore, although it would be difficult, he was in a better position to pay the parties' debt. Although Wife was awarded the home, her car, and a small amount of life insurance with cash value, without having had regular employment for many years, Wife would be unable to shoulder the debt that was allocated to Husband. Considering the evidence submitted at trial, we cannot conclude that the trial court erred in its allocation of marital property and debt.

Husband next challenges the trial court's decision to admit into evidence the letter from Dr. Harrison, arguing that it was inadmissible hearsay. Particularly in light of the fact that Dr. Harrison's letter was inadmissible hearsay, Husband argues, the trial court erred in awarding Wife alimony *in futuro* instead of rehabilitative alimony, and argues as well that the amount of the award, $1,000 per month, was excessive.

Again, the determination of whether a statement is hearsay and whether it is nevertheless admissible is reviewed for an abuse of discretion. *State v. Stout*, 46 S.W.3d 689, 697 (Tenn. 2001). As to the alimony award, "[t]he trial court has broad discretion in determining the type, amount, and duration of alimony based upon the particular facts of each case." *Sullivan*, 107 S.W.3d at 511. The trial court's award of alimony will not be reversed absent an abuse of discretion. *Id.* In determining a proper alimony award, the primary considerations are the need of the recipient spouse and the obligor's ability to pay. *Id.* at 510; *see Goodman v. Goodman*, 8 S.W.3d 289, 295. (Tenn. Ct. App. 1999). In making such a determination, the trial court must consider the factors enumerated in Tennessee Code Annotated § 36-5-101(d)(1)(E):

(E) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length

of term, and manner of payment, the court shall consider all relevant factors, including:

(i) The relative earning capacity, obligations, needs, and financial resources of each party including income from pension, profit sharing or retirement plans and all other sources;

(ii) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(iii) The duration of the marriage;

(iv) The age and mental condition of each party;

(v) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(vi) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(vii) The separate assets of each party, both real and personal, tangible and intangible;

(viii) The provisions made with regard to the marital property as defined in § 36-4-121;

(ix) The standard of living of the parties established during the marriage;

(x) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(xi) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(xii) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-101(d)(1)(E) (Supp. 2003). Rehabilitative alimony provides the economically disadvantaged spouse support for a period of time to enable that spouse to become and remain self-sufficient. Rehabilitative alimony is appropriate where the trial court finds that the economically disadvantaged spouse can be rehabilitated from an economic standpoint. *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000). Where such rehabilitation is not feasible, long-term support is necessary, and the court may award alimony *in futuro*. *Id.* "[A]limony *in futuro* should be awarded only when the trial court finds that 'economic rehabilitation is not feasible and long-term support is necessary.' " *Id.* at 359 (quoting *Self v. Self*, 861 S.W.2d 360, 361 (Tenn. 1993)). The general assembly has expressed a preference for an award of rehabilitative alimony, rather than alimony *in futuro*. *Id.* at 358. However, the trial court's determination of whether alimony should be rehabilitative or *in futuro* is granted wide discretion. *Id.* at 360.

Husband contends that the letter from Wife's physician is inadmissible hearsay, that the trial court erred in admitting it into evidence, and that it cannot be considered evidence that rehabilitation for Wife is not feasible. Husband argues that, considering her work experience and her degree in interior design, Wife has employable skills. He points out that Wife was only forty-nine years old as of the date of the trial, and that her artistic abilities gave her marketable skills. Husband argues that Wife testified that the main source of her depression and anxiety stemmed from their marriage. With the marriage over, he argues, and with the assistance of her physician, Wife should be able to recover and maintain gainful employment. Furthermore, Husband argues, considering the debt allocation to him and his currently reduced income, he is unable to pay Wife alimony of $1,000 per month. He claims that, even if the court attributed to him his prior income of $35,000 per year, he is unable to pay the $1,900 per month debt payment to Carroll Bank & Trust, $1,000 per month in alimony to Wife, and also his separate personal expenses.

In this case, the parties were married for almost thirty years, and Wife had no regular employment outside the home during most of that time. At the time of trial, Wife was forty-nine years old. In an apparent effort to rehabilitate herself, Wife acquired a degree from Lambuth and had sporadic jobs using her creative ability. The trial court, by awarding alimony *in futuro*, must have concluded that rehabilitation for Wife was not feasible, and that Wife would be unable to work full-time to support herself. The primary, indeed virtually the only, impediment to Wife working to support herself is her longstanding depression, under treatment by a physician, Dr. Harrison. Surprisingly, however, Wife came to trial armed only with a letter from Dr. Harrison that was clearly inadmissible hearsay. When the predictable hearsay objection was made by Husband's attorney, Wife's attorney apparently acknowledged the letter was inadmissible but protested that Wife did not have the funds to pay for the physician's deposition. Wife's counsel then said "if" such a deposition were needed, the trial court should immediately adjourn the trial and require Husband to pay for the physician's deposition. Wife's counsel did not explain why such a request was not made well in advance of the trial, since admissible evidence that Wife could not be rehabilitated was obviously necessary. Apparently focused on resolving matters quickly, the trial judge simply said "no point to it" and admitted the physician's letter into evidence.

We must conclude that the record before us contains insufficient evidence that Wife will be unable to work to support herself. Given her age and educational leave, the basis for Wife's assertion that rehabilitation is not feasible is a medical condition, namely, her longstanding depression. Wife asserts that her depression is caused by her marriage, now ended, and a chemical imbalance under treatment by her physician. Even if Dr. Harrison's letter were admissible, which it is not, the letter says only that Wife suffers from depression and "would be unable *at this time*, in my opinion, to hold down gainful employment secondary to her depression." (Emphasis added.) Apart from her own testimony, Wife simply offered no admissible evidence that, once the marriage ended, her medical condition would prevent her from working to support herself. Based on the record before us, we must conclude that Wife did not submit evidence sufficient to support the trial court's award of alimony *in futuro*, and that the award was therefore an abuse of discretion.

Under these circumstances, the award of alimony *in futuro* must be reversed, and the cause remanded for the trial court to consider an appropriate award of rehabilitative alimony. The payments of $1,000 per month shall continue until the trial court determines the amount and duration of rehabilitative alimony that should be awarded.

Husband next argues that the trial court erred in ordering him to maintain health insurance for Wife, and in ordering him to maintain a life insurance policy with Wife as beneficiary as security for the alimony payments. Husband argues that both of these financial burdens exceed his ability to pay, and that the trial court failed to consider Wife's ability to be rehabilitated.

The evidence at trial indicated that Morrissett Tire provided Husband with family medical insurance and life insurance as part of his employment benefits, and, there was no evidence that those benefits will be discontinued. In light of all of the evidence at trial, including Wife's lack of regular employment and her existing medical condition, the requirement to provide medical coverage was not improper. The order to maintain life insurance, however, must be reconsidered on remand in light of our reversal of the award of alimony *in futuro*. Particularly since life insurance for Husband is apparently a benefit of his employment, an order that he maintain life insurance for Wife's benefit, consistent with the award of rehabilitative alimony, may be considered by the trial court on remand. *See Emison v. Emison*, No. W1998-00591-COA-R3-CV, 1999 WL 1336054, at *11-*12 (Tenn. Ct. App. Dec. 27, 1999) (upholding order to provide life insurance for benefit of children when obligor parent submitted no evidence of cost to show an inability to pay); *see also Zettersten v. Zettersten*, No. M1999-01186-COA-R3-CV, 2000 WL 1231372, at *4 (Tenn. Ct. App. Aug. 31, 2000) (upholding order to provide life insurance for the benefit of the wife to secure alimony payment).

Husband next challenges the trial court's award to Wife of $3,721.11 in attorney's fees as alimony *in solido*. Again, such an award of alimony is not reversed on appeal unless the trial court has abused its discretion. *Lindsey v. Lindsey*, 976 S.W.2d 175, 180-181 (Tenn. Ct. App. 1997). Because the award of attorney's fees constituted a component of the alimony award, the trial court must balance the factors in Tennessee Code Annotated section 36-5-101. *Heideman v. Heideman*, No. W2001-01486-COA-R3-CV, 2002 WL 31730897, at *4 (Tenn. Ct. App. Nov. 27, 2002);

-13-

*Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App.1995). We have already addressed the most important factors in an award of alimony, namely, the need of the disadvantaged spouse and the ability of the obligor spouse to pay. *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001) (quoting *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995)). An award of attorney's fees is "appropriate when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses or would be required to deplete his or her resources in order to pay these expenses." *Smith v. Smith,* 984 S.W.2d 606, 610 (Tenn. Ct. App. 1997) (citing *Brown v. Brown*, 913 S.W.2d 163 (Tenn. Ct. App. 1994)). Although we have reversed the trial court's award of alimony *in futuro*, under all of the circumstances of this case, including the lack of liquid assets awarded to Wife, we find that the award to Wife of $3,721.11 as alimony *in solido* for attorney's fees in connection with this litigation was not an abuse of discretion, and it is affirmed.

Finally, Husband argues that the trial court erred in refusing to grant his motion for rehearing, reconsideration, and/or for a new trial based on a change in the parties' circumstances that occurred after the March 2002 trial. Husband's motion asserted, among other things, that the final decree required him "to perform impossible facts [sic] involving property divisions that were unilaterally divided by creditor foreclosures, all prior to entry of the decree." On March 26, 2003, Husband submitted a document entitled "Legal Brief of Law and Facts in Support of Motion to Reconsider Divorce Findings and Judgment Based upon Supplemental Facts." In that memorandum, Husband asserted that he could not transfer title to the house to Wife, and he could not take ownership in the Morrissett Tire stock, because the bank had foreclosed on those assets in order to satisfy his obligation to pay the loan to Carroll Bank & Trust. Husband attached as exhibits letters notifying him that those two assets would be put up for sale. The trial court denied Husband's motion to reconsider. On appeal, Husband asserts that the house was sold to Wife's brother-in-law for $67,000, and the stock in Morrissett Tires was sold to Husband's brother for $70,000. Thus, according to Husband, there still remained a debt to Carroll Bank & Trust in the amount of $50,000. Considering these post-trial facts, Husband argues, the trial court should have reconsidered its distribution of assets and allocation of marital debt.

Husband apparently filed his motion under Rules 52.02, 59.02 and/or 59.04 of the Tennessee Rules of Civil Procedure, which are each reviewed for an abuse of discretion. *Ruff v. Raleigh Assembly of God Church, Inc.*, No. W2001-02578-COA-R3-CV, 2003 WL 21729442, at *8-9 (Tenn. Ct. App. July 14, 2003). In this case, the trial judge stated expressly that his distribution of the parties' assets and debts was tied to the alimony award to Wife. In light of our reversal of the trial court's award of alimony *in futuro*, we must also reverse the trial court's denial of Husband's motion to reconsider, since the trial court must be able to examine on remand the full circumstances of the parties in connection with the issue of alimony.

The decision of the trial court is affirmed in part and reversed in part and remanded for further proceedings not inconsistent with this Opinion. Costs on appeal are to be taxed equally to

-14-

Appellant James R. Morrissett, Jr., and his surety, and to Appellee Robbie Claire McKee Morrissett, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE